| | |
|---|---|
| Michael Cohen - #98066 | E-filing |
| LAW OFFICES OF BRUCE E. KRELL | |
| Grove Law Building | |
| 345 Grove Street | |
| San Francisco, CA 94102 | |
| 415/861-4414 | |
| Fax: 415/431-4526 | |

Original
FILED
3/24/08
Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Francisco

Attorney for Plaintiffs

ADR

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA

THE FAMILY OF SAMUEL SHULL: Linda Rines Shull, Samuel J. Shull, Jr., Jennifer Shull, Cameron Rines-Caban, Jacob A. Rines-Caban, Nathan Shull, Soaring Eagle (LeeAnn) Rines, Casey Shull, Alberta Rines and Willie Smith,

    Plaintiffs,

vs.

Keystone America Inc., dba Jones and Lewis Clear Lake Memorial Chapel, and DOES 1-100,

    Defendants.

No. C08-01601 JL

**FIRST AMENDED COMPLAINT (AS OF COURSE)**

Plaintiffs, by and through counsel, hereby complain against Defendants as follows:

**JURISDICTION**

1.    This action arises out of the mis-handling, by Defendant Cemetery and Funeral Licensees, of the body of Plaintiffs' Decedent SAMUEL SHULL. Jurisdiction is founded upon 28 USC 1332, in that the Plaintiffs are citizens of California, and the named Defendant is a citizen of Delaware, where it is incorporated, and Florida, where its principal place of business is located.

**INTRA-DISTRICT ASSIGNMENT**

2.    A substantial part of the events and/or omissions complained of herein occurred in Lake County, California, and this action is properly assigned to the Oakland or San Francisco

1

1    Divisions of the United States District Court for the Northern District of California.

**PLAINTIFFS**

3.    Plaintiff LINDA RINES-SHULL is the Wife of Decedent SAMUEL SHULL (hereinafter Mr. SHULL).

4.    Plaintiff SAMUEL J. SHULL JR. is the Son of Mr. SHULL.

5.    Plaintiff JENNIFER SHULL is the Daughter of Mr. SHULL.

6.    Plaintiff CAMERON RINES-CABAN is the Stepson of Mr. SHULL, who related to Mr. SHULL as his best friend.

7.    Plaintiff JACOB A. RINES-CABAN is the Stepson of Mr. SHULL.

8.    Plaintiff NATHAN SHULL is the Son of Mr. SHULL.

9.    Plaintiff SOARING EAGLE (LEEANN) RINES is the Step-Daughter of Mr. SHULL; for whom Mr. SHULL was her "real", functioning father.

10.    Plaintiff CASEY SHULL is the Daughter of Mr. SHULL.

11.    Plaintiff ALBERTA RINES is the Sister-in-Law of Mr. SHULL.

12.    Plaintiff WILLIE SMITH is the Step-Son of Mr. SHULL, with whom he was extremely close.

13.    Mr. SHULL was the center of a very close-knit, extended family which included all the Plaintiffs herein, both blood and non-blood relatives, for all of whom (sometimes even more so with the non-blood relatives) Mr. SHULL was the paternal figure around which they cohered so as to provide the real family function that is so meaningful especially for people whose blood family ties have been weakened by the destructive effects of modern life on the family structure.

**DEFENDANTS**

14.    Defendant KEYSTONE AMERICA INC., dba JONES AND LEWIS CLEAR LAKE MEMORIAL CHAPEL, at all times herein mentioned was a corporation, organized in Delaware, with its principal place of business in Florida, and licensed by the State of California

to engage in the cemetery and funeral profession.

15.     Plaintiff is informed, believes and thereon alleges that, at all times herein mentioned, Defendants DOES 21 through 40, inclusive, and each of them, were and are individuals, duly licensed under California laws to perform various functions in the cemetery and funeral profession, including but not limited to the following functions: Cemetery Manager, Crematory Manager, Cemetery Broker, Cemetery Broker Additional, Cemetery Salesperson, Cremated Remains Disposer, Funeral Director, and/or Embalmer, and were engaged in those functions as agents and/or employees of the above-mentioned corporate Defendants, and each of them, in Lake County, California; and, at all times herein mentioned, were acting within the course and scope of this agency and/or employment.

16.     Plaintiff is informed, believes and thereon alleges, that, at all times herein mentioned, Defendants DOES 61 through 100 inclusive, and each of them, were engaged and/or employed in various capacities in the cemetery and funeral profession, including but not limited to the following capacities: Cemetery Manager, Crematory Manager, Cemetery Broker, Cemetery Broker Additional, Cemetery Salesperson, Cremated Remains Disposer, Funeral Director, and/or Embalmer, acting in the aid or assistance of the named Defendants and each of them, and acting within the course and scope of this engagement, agency and/or employment.

17.     Plaintiff does not know the true names and capacities, whether corporate, associate or individual, of all Defendants DOES 1 through 100, inclusive, and therefore sues them by those fictitious names.  Plaintiff is informed and believes, and thereon alleges, that each of those Defendants was in some manner negligently and legally responsible for the events and happenings alleged in this complaint and for plaintiff's injuries and damages.

18.     Plaintiff is informed and believes, and thereon alleges, that, at all times mentioned, each of the Defendants, named and DOES, was the agent and employee of each of their codefendants, and in doing the things alleged in this complaint were acting within the course and scope of that agency and employment.  Moreover, the conduct of each Defendant

1  herein was authorized and/or ratified by each of the remaining Co-Defendants; and each
2  Defendant, when acting as a principal, was negligent in the selection and hiring of each other
3  Defendant as an agent or employee.

4      19.    At all times herein mentioned, the events and happenings herein referred to
5  occurred in Lake County, California.

## FACTS

7      20.    SAMUEL SHULL (hereinafter Mr. SHULL) was a disabled, but very vibrant and
8  alive, combat veteran, with an extended, loving family of which he was the emotional center,
9  when he was murdered on March 24, 2006.  When Plaintiff LINDA RINES-SHULL, Sam's wife
10 of almost 30 years (hereinafter Mrs. SHULL), arrived at the hospital, a representative of
11 Defendants and of each of them was there, and observed Mrs. SHULL's understandable state of
12 extreme grief.  An appointment was made for the family to meet representatives of Defendants
13 and each of them at their mortuary, 6 days later, for the purpose of making final arrangements.

14     21.    On March 27, 2006, the van of Defendants and each of them carrying Mr.
15 SHULL's body crashed into another vehicle at high speed because of the gross negligence of
16 Defendants' and each of their 18 year old driver.  Because Mr. SHULL's body was improperly
17 secured, it was savagely mangled in the crash, especially about the face, head and upper body, all
18 of which had been unaffected by the murder except for a small entry wound below the ribcage.
19 The police, following official procedure, did not inform the family but instructed the
20 representative of Defendants and of each of them to inform the family, which no representative
21 of Defendants and/or of each of them did.

22     22.    On March 30, 2006, Mrs. SHULL, along with Plaintiffs ALBERTA RINES
23 (hereinafter ALBERTA) and WILLIE SMITH (hereinafter Mr. SMITH), went to Defendants'
24 and each of their mortuary.  Present were a man and a woman representing Defendants and each
25 of them.  No one had informed anyone related to Mr. SHULL's family about the crash; and
26 while Defendants' and each of their representatives discussed final arrangements, financing and

insurance with Mr. SHULL's family for over two hours, nobody even hinted that anything like that had taken place.

23. The woman representative did all the talking; the male representative walked back and forth behind the desk. The woman quoted $2,600.00; but, when Mrs. SHULL commented that the charge for similar arrangements when her sister had died recently were only $1,800.00, the woman representative immediately agreed to $1,800.00, which, all of a sudden, began to feel very strange to Mrs. SHULL, i.e., that, after going over the options in impossible detail, for something like 2½ hours straight, resulting in the quote of a presumably well considered price, the representatives of Defendants and each of them would, all of a sudden, simply give up almost ⅓ of that price without even blinking; and the family began to notice the very unusual affect of the representatives, with the woman having an expression of fear, and the man pacing energetically (even obsessively) back and forth behind the desk, without saying a word.

24. With these undercurrents not rising much to the level of consciousness, and with the conclusion of the final arrangement subjects having been reached (the family having decided on cremation and communications having been concluded to secure financing for all the necessary procedures), the family made ready to leave; but, as they were leaving, Mrs. SHULL realized that she would like to see her husband one last time, to say goodbye and to give him her love for his final journey; and, consequentially, she asked to do so.

25. Immediately, the male representative became visibly tense, and he told the family he did not think, in the circumstances, that seeing the body would be emotionally beneficial to Mrs. SHULL's well-being; but Mrs. SHULL felt strongly that she wanted to see her husband one last time, and she felt she would be able to handle the love she would feel for his memory. But the female representative nevertheless continued to try to dissuade Mrs. SHULL, telling her, presumptuously, that she should not put herself through that, and that she's already had closure when she saw him at the hospital.

First Amended Complaint (As of Course)

26. But Mrs. SHULL told her she felt she needed to see her husband, to tell him goodbye and that she loved him. The male representative relented, told the family to give him a minute to make the body viewable, and left the room.

27. While he was out of the room, the female representative went over the paperwork yet again. After about 15-20 minutes, the male representative came back, and asked Mrs. SHULL if she could wait until later or the next day so he could make the body more viewable; but Mrs. SHULL wanted to get this over with, and she had a strong felt need to see her husband; so the male representative left again, this time for about 20 minutes; and, while everyone was waiting again, Mrs. SHULL asked what the problem was, she just wanted to see her husband a last time.

28. The female representative responded, it would appear rather aggressively, by asking Mrs. SHULL if she was taking anything for her grief. Mr. SMITH then asked what was taking so long, and the female representative said that everything was just fine, and this is normal procedure because they had not prepared the remains for viewing.

29. When Mr. SMITH then asked how much longer this would take, the male representative returned, flustered, sleeves rolled up, tie loosened, and again said he did not think it would be physically, emotionally or mentally healthy for Mrs. SHULL to view the body - adding, all of a sudden, that the remains were in bad shape. Mr. SMITH asked how bad the body could be for having only been stabbed in the chest; and the male representative, startlingly, said that the body had started to decay, that, because of the autopsy, the body was unrecognizable, and that the family, in any case, would not be able to see Mr. SHULL as he was; so, again, maybe it would be better to remember him as he was.

30. This immediately rang false. Mrs. SHULL knew it was not true about the decomposition because Mr. SHULL had only been dead for 5 days, and she had had personal experience dressing bodies of family members as long as 2½-weeks dead. Mr. SMITH questioned whether or why the autopsy could have destroyed the body, which he had never heard

6

of; and what would have happened if the family had decided on an open casket, an option that had been discussed in the lengthy conversation that followed their arrival that day at Defendants' and each of their premises to make the final arrangements.

31. Mrs. SHULL became more and more upset. The male representative then left the room again, then returned, asking for calm; and then, with it becoming more apparent with each false response that there was something seriously wrong that these representatives were trying to cover up, he, in essence, spilled the beans: The body was damaged when the van in which it was being transported crashed and the body was thrown from the vehicle.

32. SHOCKED SILENCE. Mr. SMITH asked for more information, and why the family had not been informed, everybody becoming agitated as they realized not only that they were been lied to, but that a cover-up had been underway for days. The representatives then desperately attempted to switch the charade to a new level, saying that the reason they did not tell the family was that they knew the family was going through a rough time, but that they planned to tell the family on the day already made for their appointment, an obvious lie in the circumstances.

33. Mrs. SHULL, nevertheless, insisted on seeing the remains. The male representative again left the room; but, instead of coming back and taking Mrs. SHULL to view the body, he returned with papers for the family to sign, the intent of which was apparently to relieve Defendants and each of them from the consequences of their acts. But the family, smelling a rat, declined to sign anything.

34. Mrs. SHULL was now even more upset and determined to see her husband. The male representative told her she was the only family member who could view the body, and she had to be accompanied by the female representative; the representatives realized that the family was not going to sign these documents that were being foisted on them out of the blue at the 11th hour.

35. What they showed Mrs. SHULL was, in a way, even more grotesque than the

7

First Amended Complaint (As of Course)

mangling the body had received in the vehicle collision. They had placed a bag over the head with a hole cut over the eyes, nose and mouth.

36. Horrified, Mrs. SHULL tore away the bag, and found Mr. SHULL's head had suffered serious crush and other damage; his head was so loosely connected to his body due to the tearing effect of the crash that his chin was sitting on the end of his right shoulder. The right side of his head was flat; there were broken bones sticking out; his jaw was broken in at least four places; one cheek was a number of inches higher than normal; there were major slashes on his face; one eye was going one way, and the other was pushed in; his left cheekbone was caved in; some hair had been torn out of the right side; the right side of his forehead was pushed up about 2 inches; his right jawbone was in his ear, the left jawbone was near his collar bone; his hair was covered with blood; but, of course, there was no decomposition.

37. Because Mrs. SHULL had, by that time, been with the body so long, her sister came in. To ALBERTA, who had known Mr. SHULL for many years, the distortion was so bad that she was not sure it was really him; she had to check a tattoo she knew he had.

38. When Mrs. SHULL and ALBERTA came back into the reception room, anger was now added to Mrs. SHULL's pain. In response, the male representative's tone began to get louder and louder; and the female representative looked like she was going to faint.

39. The male representative said that they had the van destroyed the day after the crash, when the insurance company declared it totaled, which statement feels as though it involves something suspicious in the geographical and economic context of a classic American rural underdeveloped area where wrecked car and wrecks of other machinery regularly dot the landscape for years. With attitudes of intentional insensitivity toward the family's suffering or toward anything other than the bottom line, the representatives offered to cremate Mr. SHULL's body free in exchange for promises not to sue and not to tell anybody about the facts involved in this matter, stating that they had the papers already drawn up for the family to sign; and when the family left without making that insulting agreement, the male representative taunted them,

saying they should have taken the offer because they are not going to get anything better.

40. The following day, Plaintiff NATHAN SHULL came and saw the body, to his horror; and, to Mrs. SHULL's further horror, she found out in the days which followed that, for whatever unknown, and perhaps unknowable, reasons, Defendants and each of them had left Mr. SHULL's body out of cold storage, for days.

41. Also in those days, Mrs. SHULL's feelings, about the murder, the horrible feeling that Defendants and each of them had killed Mr. SHULL again, mind-pictures of Mr. SHULL's mangled body, the sickening feeling that the family was kept in the dark and lied to, to their face, about the vehicle collision and the effect on the body -- all these feelings kept swirling around in her, and she could not stop them from accelerating to the point where she tried to commit suicide, by taking pills. Nor did this pain cease; the same thoughts, several times exploding into suicide attempts, have continued to torment her since then, and she has had to seek medical attention and even hospitalization for this on numerous occasions.

42. The SHULL family lost its center because of the death of Mr. SHULL. Defendants and each of them are responsible for an institution in our culture the function of which is to help people, with the utmost sensitivity to the spiritual values pertaining in the particular locale, to process one of the most important events in their lives.

43. Because of the abhorrent way in which Defendants and each of them mis-handled this solemn obligation, the members of the SHULL family have been unable, and may never be able, to attain the closure around Mr. SHULL's death of which they were in such particular need because of the sudden way in which he was taken from them. This need was particularly keening for this family because of the atomization of the modern family which tends so strongly to isolate us all in this big society starting as early as the age at which we can first see our ability to be separate, against which, for all the people in this family Mr. SHULL stood, welcoming and protecting all.

//

**FIRST CAUSE OF ACTION [Breach of Contract]**

44.     PLAINTIFFS refer to paragraphs 1 through 43, inclusive, of this Complaint and by this reference make them a part hereof.

45.     From and after the time of contracting, Defendants, and each of them, so negligently failed to exercise the proper degree of knowledge, skill and care in attending to their and each of their duties pertaining to Mr. SHULL's body and to the Plaintiff members of Mr. SHULL's family that those PLAINTIFFS and each of them were caused to suffer the injuries and damages alleged herein.

46.     The contract was oral and written.

47.     The contracting Plaintiff members of Mr. SHULL's family performed all their obligations to Defendants and each of them.

48.     As a legal and proximate result of the acts of Defendants and each of them, the Plaintiff members of Mr. SHULL's family were caused to sustain the herein described injuries and damages.

WHEREFORE, PLAINTIFFS pray judgment as set forth below.

**SECOND CAUSE OF ACTION [Negligence]**

49.     PLAINTIFFS refer to paragraphs 1 through 48, inclusive, of this Complaint and by this reference make them a part hereof.

50.     Defendants and each of them performed their professional duties to the Plaintiff members of the SHULL family, including but not limited to Cemetery Manager, Crematory Manager, Cemetery Broker, Cemetery Broker Additional, Cemetery Salesperson, Cremated Remains Disposer, Funeral Director, and/or Embalmer, so negligently as to cause said PLAINTIFFS to sustain the herein described injuries and damages.

51.     In:

   a.     Delegating the securing and driving of Mr. SHULL's body to an incompetent and reckless driver in conscious disregard of the rights and safety of others,

1  b. Hiring and maintaining, in a position calling for the utmost of sensitivity toward people in as profoundly sensitive position as life normally gets, the representatives whose conduct toward Plaintiffs was so deceitful and insensitive to Plaintiffs' raw sensitivities that Defendants had to have known, in conscious disregard of the rights of others, about those representatives' predilections to conduct themselves thusly;

c. Trying to hide the damage to Mr. SHULL's body from the Family,

d. Dissembling about extent of the damage to Mr. SHULL's body,

e. Misrepresenting the reason for the damage to Mr. SHULL's body,

f. Precipitously getting rid of the evidence of the above-referenced van,

g. Trying to bully and bamboozle Plaintiffs, who are legally un-sophisticated people, into a cheap, whitewash settlement of Defendants' torts against Plaintiffs;

h. Failing to care for the body following its damage in the crash; and

i. Ratifying Defendants' representatives' above-described conduct, Defendants and each of them engaged in despicable conduct in conscious disregard of the rights and safety of others.

WHEREFORE, Plaintiffs, and each of them, pray judgment against Defendants, and each of them, for the following:

A. General damages according to proof;

B. Special Damages according to proof;

C. Punitive Damages;

D. Pre-Judgment Interest according to law;

E. Costs of this action; and

F. Any other and further relief that the court considers proper.

DATED: April 17, 2008                        LAW OFFICES OF BRUCE E. KRELL, INC.


_____
MICHAEL COHEN

11

First Amended Complaint (As of Course)

**DEMAND FOR JURY TRIAL**

PLEASE TAKE NOTICE that Plaintiffs hereby demand a trial by jury in this matter. That is, pursuant to Federal Rules of Civil Procedure ("FRCP"), Rule 38, Plaintiffs demand a trial by jury as is their guaranteed right. Pursuant to FRCT, Rule 39, Plaintiffs request that the matter be designated as a jury action upon the Court's docket.

DATED: March 24, 2008              LAW OFFICES OF BRUCE E. KRELL, INC.

By_____
   Michael Cohen

First Amended Complaint (As of Course)